UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DIANE L. NIEMAN,

    Plaintiff,

vs.

Case No. 07-CV-12629
HON. GEORGE CARAM STEEH

GENERAL MOTORS CORPORATION,

    Defendant.

_____/

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (#18)

Defendant General Motors Corporation (GM) moves for summary judgment of plaintiff Diane Nieman's claims that she was discharged in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101, et seq.,(ADA), and Michigan's Persons with Disabilities Civil Rights Act (PWDCRA), M.C.L. §§ 37.1101, et seq.. A hearing on the motion was held on September 29, 2008. For the reasons set forth below, GM's motion for summary judgment will be GRANTED.

**I. Background and Record Evidence**

Diane Nieman filed a First Amended Complaint on July 2, 2007 alleging she was working as a GM Engineering Manager on May 26, 2006 when she was approved for medical leave for a bipolar condition. Nieman alleges she was discharged when she returned from medical leave on July 17, 2006, on the pretext that she had misused her GM corporate credit card. Count I alleging age discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq., and Michigan's Elliott-Larsen Civil Rights

Act (ELCRA), 37 M.C.L. § 37.2201, et seq., was dismissed by stipulation on July 15, 2008. Count II alleges disability discrimination in violation of the ADA and PWDCRA. Count III alleges intentional discrimination and seeks punitive damages under Title VII. Count IV alleges intentional infliction of emotional distress.

GM hired Nieman at a 6th Level position on May 16, 1985. By June 1, 1999, Nieman had received five promotions and attained the position of 8th Level Design Manager. On December 1, 2001, Nieman transferred from the GM Technical Center in Warren, Michigan, to Pontiac, Michigan as a Superintendent of Manufacturing Engineering. Four months later, on April 1, 2002, Nieman transferred to SPO World Headquarters in Grand Blanc, Michigan, as an Engineering Group Manager (EGM).

In July 2002, GM informed Nieman that an internal audit of her corporate GM credit card use revealed $38,593.00 in unauthorized charges for personal expenses. Nieman signed a July 15, 2002 document stating she was "aware of the policies regarding personal use of the GM business card," and agreed to repay the charges using payroll deductions. Defendant's Exhibit 11. The July 15, 2002 document warned: "Subsequent flagrant violations of Corporate Card policies will result in further disciplinary action, up to and including separation from GM." Id.

Two years passed when, on July 2, 2004, GM conducted a second internal investigation regarding "questionable expenses for fuel and transportation charges" on Nieman's November 2002 through May 2004 expense reports. Charges included $51.00 for a health spa, fuel charges incurred during vacation days and weekends, and $300.00 for "Gaming Cash Advances" from a Las Vegas hotel. Defendant's Exhibit 17. Nieman offered GM legitimate reasons for the charges, and was counseled by GM's Carl

2

Hammaker. GM Human Resources (HR) Representative Ty Fouchey noted in a July 29, 2004 memo that Hammaker told Nieman "if we could prove any of this we would be talking discharge[.]" Defendant's Exhibit 18. Fouchey also observed that Nieman "[would] be audited in the future and failure to comply with all audit requirements could jeopardize her employment with GM." Id. GM sent all GM corporate cardholders an August 3, 2004 memo, which Nieman acknowledges receiving, stating that intentional misuse of a GM corporate credit card "may lead to suspension of card privileges and other disciplinary actions, up to and including discharge." Defendant's Exhibit 19. Nieman was not disciplined as a result of this 2004 investigation.

On August 1, 2004, Nieman transferred back to the GM Technical Center as an EGM, and began working for Roger Baywol as an EGM for Overhead Systems in October 2005. Prior to January 2006, Nieman left Baywol two voice-mails apologizing for her disruptive behavior in staff meetings, and telling Baywol she would "work on it." Nieman January 25, 2008 Tr., at 100. Baywol's January 2006 midyear appraisal of Nieman, referred to as a "PMP", was generally positive, but also contained criticism: "Often overstates situations with too much emotion, has made my job of running staff meetings difficult at times. Has been highly emotional/confrontational to director on three specific occasions[.] . . . . Behavior borders on insubordination." Defendant's Exhibit 21. The PMP prepared by Baywol further stated "Health concerns often require use of sick days on short notice . . . approx. 8 sick days taken thus far in 2006, but unable to differentiate sick vs. vacation days in [automated system] GMTKS. A significant percentage of vacation is taken on short notice also." Plaintiff's Exhibit 4.

According to Nieman, GM took her medication Effexor off a list of approved medical

3

plan drugs in January 2006, forcing her to be "weaned off" the drug and causing her condition to decline. Nieman January 25, 2008 Tr., at 209-210. Nieman testified that she told Baywol in early 2006 that she was having severe mood swings, was exhausted, couldn't focus, and was very hyper. Id. at 95, 99. Nieman further testified that, after she told Baywol she was having severe mental problems and that her sister, a registered nurse, thought she should be medicated, Baywol "started making jokes about ADD (attention deficit disorder)." Id. at 96. Nieman testified that she talked again with Baywol in May 2006, telling him that she was stressed, was missing time at work, was having trouble getting up in the morning, and that doctors' appointments were tough to get after working hours. Nieman January 25, 2008 Tr., at 107-108.

Nieman began reporting to Bill Gooding on May 1, 2006, as part of a GM reorganization. Baywol was Gooding's direct supervisor. According to Gooding, Baywol never mentioned having attendance problems with Nieman. Gooding sent Nieman a May 4, 2006 e-mail asking Nieman to call him so the two could discuss her new assignment. Defendant's Exhibit 23. Gooding sent Nieman a May 5, 2006 e-mail asking Nieman to schedule a meeting with him. Id. Gooding sent Nieman a May 10, 2006 e-mail asking Nieman whether she had attended a particular meeting, to which Nieman responded the same day that she had not. Id. Gooding asked Nieman in a May 11, 2006 e-mail for information regarding her vacations and emergency contact information, and specifically asked: "What are your standard working hours?" Id. Nieman responded four days later in a May 15, 2006 e-mail:

> I usually start between 7:30 and 8:00. Right now, my health has deteriorated again. I have another doctors appointment and tests this afternoon and tomorrow. . . .

4

Defendant's Exhibit 23.  Nieman testified that she called HR Representative Waikikse Ray during the first week of May 2006, and told her that Gooding's management style was adversely affecting her mental health.  Nieman January 25, 2008 Tr., at 84-85.

On May 16, 2006, Gooding scheduled a May 22, 2006 meeting with Baywol and Ray to discuss Nieman as "a problem employee."  Plaintiff's Exhibit 8.  At the meeting, Gooding, Baywol, and Ray discussed Gooding's inability to locate Nieman, and Nieman's failure to report sick and vacation days on an automated GM system.  Baywol mentioned to the group that there were a number of Nieman's personal credit card transactions awaiting his approval.  Following the meeting, HR Representative Ray began an investigation and audit of Nieman's corporate credit card charges, as well as Nieman's "badge swipes" into the office.  From the "badge swipe" audit, Ray learned that Nieman had been in the office seven days for the period May 1 through May 25, 2006, five hours on one of the days, and three hours on the remaining six days.

On May 25, 2006, Gooding e-mailed Nieman:

> As I mentioned in a previous communication I expect you to be in the [office] during your standard working hours.  I do realize you have had some health issues and doctor appointments, I would expect you to schedule doctor appointments so you can work partial (4-6 hours) days of the appointment, unless you are too ill to work.  . . . .

Defendant's Exhibit 23.  Nieman went on disability sick leave the next day, May 26, 2006.

According to HR Representative Ray's June 6, 2006 notes, the 2006 audit of Nieman's GM credit card use revealed "various personal expenses from 2005 and 2006," ranging from online purchases to hotel stays in Florida and South Dakota.  Defendant's Exhibit 25.  Ray's June 6, 2006 notations also include the comment: "The question left unanswered was why did the Director [Baywol] approve these charges?"  Id.  Baywol

5

admitted during his deposition that he had approved certain personal expenses for a South Dakota Hotel room in July of 2005, and retail expenses at Nordstrom and Hudson's on March 9, 2006. Baywol June 12, 2008 Tr., at 58. GM discharged Nieman on July 17, 2006 based on the 2006 credit card audit and the July 15, 2002 document signed by Nieman stating: "Subsequent flagrant violations of Corporate Card policies will result in further disciplinary action, up to and including separation from GM."

### III. GM's Motion for Summary Judgment

### A. Standard of Review

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001). The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in a light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Redding, 241 F.3d at 532 (6th Cir. 2001). If the movant establishes by the use of materials specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." First

Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986). Rather, there must be evidence on which a jury could reasonably find for the non-movant. McLean, 224 F.3d at 800.

### B. Claims of Title VII Punitive Damages and Intentional Infliction of Emotional Distress

Nieman conceded at the September 29, 2008 hearing that she could not prove her claim for punitive damages under Title VII as alleged in Count III, or her claim of intentional infliction of emotion distress as alleged in Count IV. GM is entitled to summary judgment of Counts III and IV as a matter of law. Amway Distributors, 323 F.3d at 390.

### C. Disability Discrimination Under the ADA and PWDCRA

Both Michigan and federal courts recognize that the legal analysis of a state law PWDCRA claim essentially tracks the analysis of a federal ADA claim, and therefore resolution of the ADA claim generally resolves the PWDCRA claim. Cassidy v. Detroit Edison Co., 138 F.3d 629, 634 n.3 (6th Cir. 1998) (citing Monette v. Electronic Data Sys. Corp., 90 F.3d 1173, 1178 (6th Cir. 1996)); Chmielewski v. Xermac, Inc., 457 Mich. 593, 602, 580 N.W.2d 817 (1998); Chiles v. Machine Shop, Inc., 238 Mich. App. 462, 474, 606 N.W.2d 398 (2000) (applying three-step analysis articulated in Bragdon v. Abbott, 524 U.S. 624, 631 (1998) for determining whether a person has a "disability" under the ADA in adjudicating whether a person has a "disability" under the PWDCRA). A prima facie case of disability discrimination under the ADA requires proof that: (1) the plaintiff is an individual with a disability as defined under the ADA; (2) she is otherwise qualified to perform the job

requirements, with or without reasonable accommodations; and (3) she was discharged "solely" by reason of her disability. Williams v. London Utility Commission, 375 F.3d 424, 428 (6th Cir. 2004) (quoting Cotter v. Ajilon Servs., 287 F.3d 593, 598 (6th Cir. 2002)); Monette, 90 F.3d at 1178. To establish a prima facie case of disability discrimination under the PWDCRA, the plaintiff must prove that: (1) she is disabled as defined under the PWDCRA; (2) that her disability is unrelated to her ability to perform her job duties; and (3) that she was discriminated against in a manner prohibited by the PWDCRA, i.e. that she was discharged because of her disability. Peden v. City of Detroit, 470 Mich. 195, 204, 680 N.W.2d 857 (2004) (quoting Chmielewski, 457 Mich. at 602); M.C.L. § 37.1202(1)(b) (providing that "an employer shall not . . . [d]ischarge . . . an individual . . . because of a disability . . . that is unrelated to the individual's ability to perform the duties of a particular job or position."). A claim of disability discrimination under the ADA or PWDCRA may be proven by either direct evidence or circumstantial evidence. Monette, 90 F.3d at 1178; Hedrick v. Western Reserve Care System, 355 F.3d 444, 452 (6th Cir. 2004).

### i. Direct Evidence

"In discrimination cases, direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." In Re Rodriguez, 487 F.3d 1001, 1007 (6th Cir. 2007) (analyzing ELCRA national origin employment discrimination claim and quoting Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp., 176 F.3d 921, 926 (6th Cir. 1999)). "Consistent with this definition, direct evidence of discrimination does not require a fact-finder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." In Re Rodriguez, 487 F.3d at 1007

(quoting Johnson v. Kroger Co., 319 F.3d 858, 865 (6th Cir. 2003)).

Nieman's proffered evidence does not constitute direct evidence of unlawful discrimination. Contrary to Nieman's argument, Baywol's January 2006 joke that Nieman probably had attention deficit disorder, Gooding's May 2006 attendance concerns and reference to Nieman as a "problem employee," and Nieman's complaints to Baywol, Gooding and Ray about her escalating mental health problems do not combine to *require* a finding that Nieman's discharge was motivated in part by prejudice against disabled individuals. In Re Rodriguez, 487 F.3d at 1007. Baywol's unspecified "joke" was made four months before Nieman began working for Gooding in May 2006, and six months before Nieman was discharged. Such an isolated and ambiguous comment, remote in time relative to Nieman's discharge, does not require a finding of unlawful discrimination. Blair, 505 F.3d at 525; Millner v. DTE Energy Co., 285 F. Supp. 2d 950, 966 (E.D. Mich. 2003) (citing inter alia Wells v. New Cherokee Corp., 58 F.3d 233, 237-38 (6th Cir. 1995); McCarthy v. Kemper, 924 F.2d 683, 686-87 (7th Cir. 1991); and Harrison v. Olde Financial Corp., 225 Mich. App. 601, 608 n.7, 572 N.W.2d 679 (1988)). Gooding first characterized Nieman as a "problem employee" on May 16, 2006, after sending Nieman four May 2006 e-mails attempting, without success, to communicate with Nieman about her new assignment, her vacation and contact information, and her "standard working hours," and after learning that Nieman had not attended a meeting. Gooding could legitimately distinguish between unacceptable conduct that he believed rendered Nieman unqualified to perform her new job, and Nieman's disability. See Brohm v. JH Properties, Inc., 149 F.3d 517, 521 (6th Cir. 1998) (quoting Maddox v. University of Tennessee, 62 F.3d 843, 847 (6th Cir. 1995) as recognizing "the distinction between discharging someone for

9

unacceptable misconduct and discharging someone because of the disability."). Likewise, Baywol's, Gooding's, and Ray's knowledge of Nieman's declining mental state does not *require* a finding that the three were motivated by Nieman's claimed disability when they met on May 22, 2006, or when GM ultimately decided on July 17, 2006 to discharge Nieman for the alleged misconduct of misuse of her GM corporate credit card. Construing this evidence "in context," as argued by Nieman, a reasonable jury would not be required to draw the inferences raised by Nieman and find that the decision to discharge Nieman was motivated at least in part by prejudice against disabled individuals protected under the ADA or PWDCRA. In Re Rodriguez, 487 F.3d at 1007.

### ii. Circumstantial Evidence

Absent direct evidence of discrimination, Nieman must establish her prima facie ADA and PWDCRA cases – that she is "disabled," that she is otherwise able to perform her job duties, and that she was discharged because of her disability – by means of circumstantial evidence. Daugherty v. Salar Plastics, Inc., --- F.3d ---, No. 06-4608, 2008 WL 4587204, *5 (6th Cir. Oct. 16, 2008); Macy v. Hopkins County School Bd. of Ed., 484 F.3d 357, 364 (6th Cir. 2007) (citing Monette, 90 F.3d at 1186); Williams, 375 F.3d at 428; Monette, 90 F.3d at 1178; Peden, 470 Mich. at 204. In deciding motions for summary judgment involving circumstantial evidence of disability discrimination, courts apply the familiar McDonnell Douglas framework: (1) the plaintiff must first proffer evidence from which a reasonable jury could conclude that the plaintiff has established a prima facie case; (2) if the plaintiff meets this burden, the defendant employer must proffer sufficient evidence of a legitimate reason for its actions; and (3) if the defendant meets this burden, the plaintiff must identify evidence from which a reasonable jury could conclude that the reason

10

proffered by the defendant employer is merely a pretext for unlawful discrimination. Daugherty, 2008 WL 4587204 at *5; Macy, 484 F.3d at 364 (citing Monette, 90 F.3d at 1186).

Under the ADA, a "disability" includes a "physical or mental impairment that substantially limits one or more of the major life activities." 42 U.S.C. § 12102(2)(A). A "disability" is defined under the PWDCRA to include "a determinable physical or mental characteristic of an individual, which may result from disease, injury, congenital condition of birth, or functional disorder, if the characteristic . . . substantially limits 1 or more of the major life activities of that individual and is unrelated to that individual's ability to perform the duties of a particular job or position or substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's qualifications for employment or promotion[.]" M.C.L. § 37.1103(d)(i)(A).[1] Under both the ADA and PWDCRA, corrective and mitigating measures must be considered in determining whether a person has a physical or mental impairment that "substantially limits" a major life activity. Sutton v. United Air Lines, Inc., 527 U.S. 471, 482, 488-489 (1999); Michalski v. Bar-Levav, 463 Mich. 723, 733 n.13, 625 N.W.2d 754 (2001) (citing Chmielewski, 457 Mich. at 606-607, and quoting Sutton, 527 U.S. at 482-483 for the proposition that "[a] 'disability' exists only

---

[1] A "disability" is also defined under the ADA and PWDCRA as having a record of a physical or mental impairment that substantially limits one or more major life activities, or being regarded as having such an impairment. See 42 U.S.C. § 12102(2)(B)-(C); M.C.L. § 37.1103(d)(ii-iii). Nieman admitted at the hearing that she did not pursue a disability claim before the EEOC based on having a record of, or being perceived as, having an impairment that substantially limits one or more of her major life activities. Nieman did not allege either of these theories in her First Amended Complaint, nor advance these theories in opposing GM's motion for summary judgment. Accordingly, the court will not address these unpled claims. See White v. Anchor Motor Freight, Inc., 899 F.2d 555, 558-59 (6th Cir. 1990).

where an impairment 'substantially limits' a major life activity, not where it 'might,' 'could' or 'would' be substantially limiting . . . ."). "A person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently 'substantially limits' a major life activity." Sutton, 527 U.S. at 482-483. Alternatively, if a person has an impairment that "substantially limits" a major life activity, with or without corrective measures, that person must be able to perform their job duties to establish a prima facie case of disability discrimination under the ADA or PWDCRA. Williams, 375 F.3d at 428; Monette, 90 F.3d at 1178; Peden, 470 Mich. at 204; M.C.L. § 37.1103(d)(i)(A).

Nieman has not specifically pled or asserted the major life activity substantially limited by her mental impairments of depression and bipolar disorder. Nieman instead directs the court to Burns v. Coca-Cola Enterprises, Inc., 222 F.3d 247, 253 (6th Cir. 2000) and its discussion of the major life activity of "working."[2] Nieman also cites her deposition testimony that in early 2006 she was "having severe mood swings and irritation and couldn't focus and I was exhausted beyond any exhaustion I have ever felt and I was very very hyper, couldn't sit still, couldn't focus," and that in May 2006, she was "upset, and I was stressed and I was starting to miss time and, you know, I couldn't get up to go to work in the morning[.]" Nieman January 25, 2008 Tr., at 95, 106-107. Nieman argues, however, that "there is no evidence that [her] ability to perform her essential job duties was affected by her depression," that her depression is "controlled if on her medication" Effexor, and that GM denied her the Effexor medication by refusing to pay for it beginning in January 2006. Plaintiff's August 28, 2008 Response Brief, at 19.

---

[2] "Major Life Activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

Construing the pleadings and evidence in a light most favorable to Nieman, it is beyond dispute that Nieman's depression and bipolar mental impairments, considered in light of corrective measures, did not "substantially limit" Nieman's "major life activity" of "working" because Nieman admittedly was able to perform her job duties at GM when properly medicated. Sutton, 527 U.S. at 482-483, 488-489; Chmielewski, 457 Mich. at 606-607. Nieman testified that, after changing her medication from Effexor in January 2006, she finally became "regulated" and "felt okay" when she returned to work on July 17, 2006. January 25, 2008 Tr., at 212. Asked whether there was anything she could not do when on medication, Nieman responded: "Not when the medication dosages are correct and the right one." Id. at 212. Nieman was not "disabled" on July 17, 2006 because she was able to perform her job function while on corrective medication. Sutton, 527 U.S. at 482-483, 488-489; Chmielewski, 457 Mich. at 606-607.

Construing the pleadings and evidence in a light most favorable to Nieman, it is also beyond dispute that Nieman's uncorrected depression and bipolar disorder prevented her from performing her new May 1, 2006 job duties under Gooding. Williams, 375 F.3d at 428; Monette, 90 F.3d at 1178; Peden, 470 Mich. at 204; M.C.L. § 37.1103(d)(i)(A). "An employee who cannot meet the attendance requirements of the job at issue cannot be considered a 'qualified' individual protected by the ADA." Gantt v. Wilson Sporting Goods Co., 143 F.3d 1042, 1047 (6th Cir. 1998). Likewise, "[a] condition related to an individual's ability to perform the duties of a job is not a handicap within the meaning of the [PWDCRA]." Tanker v. Figgie Int'l, Inc., 231 Mich. App. 115, 125, 585 N.W.2d 337 (1998). "Except in the unusual case where an employee can effectively perform all work-related duties at home, an employee 'who does not come to work cannot perform any of his job

functions, essential or otherwise.'" Tyndall v. National Education Centers, Incorporated of California, 31 F.3d 209, 213 (4th Cir. 1994) (quoting Wimbley v. Bolger, 642 F.Supp. 481, 485 (W.D. Tenn. 1986), aff'd, 831 F.2d 298 (6th Cir. 1987)). Nieman's argument that there is no evidence in the record to support a finding that she was unable to perform her job duties as of May 1, 2006 is belied by her own testimony that, by May 2006, she was "upset, and I was stressed and I was starting to miss time and, you know, I couldn't get up to go to work in the morning[.]" Nieman January 25, 2008 Tr., at 95, 106-107. Nieman's testimony that she was not attending work is supported by Gooding's May 2006 e-mails, and the undisputed "badge swipe" audit. GM's act of taking Effexor off of a list of drugs approved under Nieman's GM medical plan cannot be attributed to Baywol, Gooding, or Ray, the alleged decision-makers, considering Nieman testified she never told anyone at GM that she was on depression medication. Id. at 112. Nieman was not "disabled" from May 1, 2006 to July 17, 2006 because she was unable to perform her job function, assuming Nieman was unable to acquire corrective medication. Gantt, 143 F.3d at 1047; Tanker, 231 Mich. App. at 125.

In the final analysis, Nieman has failed to proffer evidence that would allow a reasonable jury to find that she is "disabled" as defined under the ADA or PWDCRA, or alternatively, that she was "disabled" and was otherwise able to perform her job duties. Daugherty, 2008 WL 4587204 at *5; Macy, 484 F.3d at 364; Williams, 375 F.3d at 428; Monette, 90 F.3d at 1178; Peden, 470 Mich. at 204. Accordingly, GM is entitled to summary judgment of Nieman's ADA and PWDCRA claims as a matter of law. Id.; Amway Distributors, 323 F.3d at 390; First Nat'l Bank, 391 U.S. at 270; McLean, 224 F.3d at 800. Having determined that Nieman has failed to proffer sufficient evidence to establish a prima

facie case, the court need not address the parties' remaining arguments as to the legitimacy of discharging Nieman for violating GM's corporate credit card policy. Daugherty, 2008 WL 4587204 at *5; Macy, 484 F.3d at 364; Monette, 90 F.3d at 1186.

## IV. Conclusion

For the reasons set forth above, defendant General Motors Corporation's motion for summary judgment is hereby GRANTED. Plaintiff Diane Nieman's claims of disability discrimination in violation of the ADA and PWDCRA are hereby DISMISSED with prejudice in their entirety.

SO ORDERED.

Dated: November 17, 2008

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on November 17, 2008, by electronic and/or ordinary mail.

s/Josephine Chaffee
Deputy Clerk